Walter J. Cutcliffe v. Commissioner.
Cutcliffe v. Commissioner
Docket No. 260.
United States Tax Court
1946 Tax Ct. Memo LEXIS 122; 5 T.C.M. (CCH) 673; T.C.M. (RIA) 46184; July 31, 1946
John L. Westmoreland, Esq., 815 William Oliver Bldg., Atanta, Ga., for the petitioner. Edward L. Potter, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies and 50 percent fraud penalties against petitioner as follows: Years
Deficiency
Penalty
1933
$ 5,544.82
$ 2,772.41
1934
4,289.69
2,144.85
1935
8,363.48
4,181.74
1936
10,632.77
5,316.38
1937
5,748.69
2,874.35
Totals
$34,579.45
$17,289.73
The questions originally presented were whether petitioner had income in the years in question which he failed to report which *123 would support the deficiencies determined; and the imposition of fraud penalties. Subsequent to the submission of briefs by the parties the Supreme Court of the United States promulgated its opinion in Commissioner v. Wilcox, 327 U.S. 404 (Feb. 25, 1946); and supplemental briefs have been filed by the parties on the question of the applicability of the doctrine of that case. Findings of Fact During the years 1933 through 1937 petitioner was a resident of Atlanta, Georgia. He derived the major part of his income from a partnership, comprised of himself, Robert H. Hogg, and Eddie Guyol, * which operated a lottery or "numbers game" in Atlanta. The enterprise was known as the Home Company. Petitioner's duties in the partnership's business consisted chiefly of supervising the outside operations of the lottery business. He acted as "trouble shooter," trying to keep things going smoothly, and keep the "pick-up" men and others in line and satisfied. He did not receive collections, nor did he pay out funds except on special occasions. He had no immediate, first-hand knowledge of the amount of the business' income or expenses. Hogg handled *124 all the money. Petitioner kept no records or accounts of his receipts during any of the years here involved. From August, 1935, until August, 1936, petitioner was serving time on the Georgia "Chain Gang," but continued to receive his pro rata share of the partnership earnings. The lottery operated as follows: A "player" picked a number and paid his money to a "writer" who recorded the transaction on a "ticket," in triplicate, one copy going to the player, one to the "writer," and one to the "pick-up" man for the Home Company. The "writer" retained 25 percent of his receipts; the "pick-up" man received 7 1/2 percent, and the remainder, 67 1/2 percent of the amount written, went to the company for the payment of losses, expenses, and profits. The ticket was received by a representative of the main office prior to the daily closing of the New York Bond Market from whose activities as reported the winning number was determined. At the main office the tickets were tabulated and the winning tickets were withdrawn for settlement. The lottery business was operated every day in the year that the New York Bond Market was open. This was approximately 298 days. Because of police raids the *125 entire play was sometimes called off. The raids were frequent; everybody and everything was taken, including all records except Hogg's "little book." The amount of business varied. The enterprise had overhead expense and sometimes had considerable losses. The Hall brothers had heavy winnings against the Home Company in 1936, and in 1937 business was not good. There were so many hits that the Home Company was not able to pay off. It took them about four days to close up; they finally paid all that they owed. Some automobiles were bought in petitioner's name and were used in the business. For the year 1933 petitioner filed a form for Federal income tax return on which he reported under his own designation as "Other Income," $10,000, and under "Deductions," stated "No Deductions." For the year 1934 petitioner filed a form for Federal income tax return on which he reported under his own designation as "Other Income," $20,000.00, and under "Deductions," stated "None Claimed." For the year 1935 petitioner received permission for late filing, and income tax forms in June, 1936, reported income aggregating $18,780.30, as follows: 1. Salaries, Fees, etc. Dixie
Freight Lines
$ 450.00
3. Interest on Bank Deposits,
Notes, Corporation Bonds, etc.
830.30
11. Other Income
17,500.00
*126 Deductions aggregating $627.26 were claimed for interest paid ($118.84); county taxes ($146.02); and state income taxes ($362.40); resulting in "Net Income" of $18,153.04. For the year 1936 petitioner filed a Federal income tax form on which he reported income aggregating $18,150, as follows: 1. Salaries, Wages, Commissions
Fees, etc. Dixie Freight Lines
$ 650.00
11. Other Income
17,500.00 Deductions aggregating $560.41 were claimed for interest paid ( $138); state and county taxes ($146.02); and state income tax ($276.39); resulting in "Net Income" of $17,589.59. For the year 1937 petitioner filed a Federal income tax form on which he reported income as follows: 6. Income (or loss) from partner-
ships, syndicates, pools, etc. (fur-
nish name and address): OTHER
INCOME [1]
$5,000.00
Under "Deductions" was typed "NO DEDUCTIONS CLAIMED." Waivers of the statute of limitations or "consents" were executed by petitioner with respect to the years 1936 and 1937. The return forms for all the years in controversy were filed with the collector of internal revenue for the district of Georgia, and indicate *127 that D. J. Gantt prepared the forms or rendered petitioner assistance in their preparation. The partners were informed that Gantt was an income tax specialist who had been with the Bureau of Internal Revenue. When the time came for filing the returns Hogg gave Gantt from his "little book" the figures of the amount of income that had been earned by petitioner; petitioner kept no records and had no other information. Hogg and he settled at no certain time. No partnership returns were filed. Petitioner had served time for conspiracy to violate the prohibition law and he did not want to go back to the United States penitentiary. Petitioner was indicted by a Federal Grand Jury on charges of income tax evasions for the years now before us. He was tried in 1941 and found not guilty on all the charges. Petitioner was informed that Hogg destroyed the book he kept when the Federal Grand Jury started investigation in 1937. Hogg died after the trial in the Federal Court but before the present hearing. Respondent determined that petitioner had taxable net income as follows: 1933
$40,864.69
1934
39,598.77
1935
53,088.29
1936
59,044.63
1937
38,330.78
Petitioner *128 has not overcome the presumption of correctness attaching to respondent's determinations. Respondent has not met his burden of proving fraud. No part of the deficiencies in question were due to fraud with intent to evade tax. Opinion Since the submission of the case at bar the Supreme Court promulgated its decision in Commissioner v. Wilcox, 327 U.S. 404 (Feb. 25, 1946), holding that embezzlement receipts did not constitute income to a taxpayer. As a result of an order by this Court, the parties filed supplemental briefs directed to a consideration of the Wilcox case. We do not find ourselves called upon to consider whether that case is of sufficient breadth to be operative in the case of illegal gambling gains, because the applicable state law of Georgia calls for factual disclosures which are completely absent from the present record. There have been no proffers of further proof. Georgia Code Annotated, Chapter 26, section 26-6501, provides that a person selling lottery tickets - either himself or through an agent - is guilty of a misdemeanor. It is further provided in section 20-505 of the Georgia Code: Gaming contracts; recovery back of consideration. *129 - Gaming contracts are void * * * Money paid or property delivered up, upon such consideration, may be recovered back from the winner by the loser, if he shall sue for the same in six months after the loss, and after the expiration of that time it may be sued for by any person, at any time within four years, for the joint use of himself and the educational fund of the county. Without evidence of the time of year of the receipts or of the possible institution of any suits for their recovery, it is impossible to say that the sums in question continued to belong to the victims as of the end of the respective tax years. The doctrine of the Wilcox case, even if applicable, would hence lack a factual foundation here. And any litigation brought by third persons under the remaining sanction of the statute would be more in the nature of a penalty subsequently recoverable than like the incomplete title of the Wilcox case. Under the fundamental issue originally presented, we are called upon to redetermine deficiencies for the years 1933 to 1937, inclusive, and to give consideration to respondent's assertion of fraud for each of the years in question. The burdens of proof are obviously on *130 petitioner for overcoming the correctness of the deficiencies determined and upon respondent with respect to the fraud issue. Leonard B. Willits, 36 B.T.A. 294. However obvious the last statement may be, its operative force in our estimation is dispositive of the case. The result admittedly might be regarded as a logical anomaly, but on the record before us we are unable to reach a different conclusion. For the purpose of sustaining petitioner's burden, the record affords little more than his self-serving statement that he reported for all the years amounts of income slightly in excess of what he actually had; that he had no records, but relied completely upon disclosures at income tax time by his now deceased partner, Hogg; that they presented their problem to a man named Gantt, who held himself out as a Federal income tax specialist; and that Hogg had destroyed the only records, a little book kept by him, shortly before a Federal Grand Jury investigation. Our consideration of the evidence leaves us far from satisfied that petitioner has thus sustained his burden. Louis Halle, 7 T.C. 245 (June 27, 1946). It is possible that some of his difficulty in *131 making his case stems from and is inherent in the illegal nature of the business, but that is a situation of his own making. The books contain frequent instances of the impossibility of acepting comparable self-serving statements. See, e.g., Domestic Management Bureau, Inc., 38 B.T.A. 640. The absence of Gantt and petitioner's failure to make a showing of his financial situation during the years in question, including his manner of living and expenditure, constitute at once additional demonstrations of petitioner's burden and of his failure to meet it. Nor do we find respondent's discharge of his obligation of proving the fraud any more satisfactory or complete. We do not have the usual situation of evidence of unexplained receipts by way of bank deposits or the like, e.g., Russell C. Mauch, 35 B.T.A. 617, affirmed (C.C.A., 3rd Cir.), 113 Fed. (2d) 555; nor of unmitigated failure to report any income. See Leonard B. Willits, supra.Respondent has attempted to establish the statutory requirement of fraud with intent to evade tax by computing, with figures estimated in testimony of employees of the illegal business, large sums of *132 icome which petitioner failed to report. Even an acceptance of the estimated figures of receipts by the illegal business cannot establish respondent's case, for there is no showing of the extent of petitioner's participation therein. The distinct implication from the record is that Hogg was the dominant partner who probably received more than any one else engaged in business with him. This failure of proof on the part of respondent cannot, in our judgment, be cured by our conclusion on the case in chief. See Leonard B. Willits, supra. It is comparable to a situation where a taxpayer admits the deficiency but denies the charge of fraud with intent to evade tax. Submission of a case in this posture could not result in a determination that respondent has sustained the burden placed upon him by the statute. The fraud issue must be resolved in petitioner's favor. There was no pleading by petitioner claiming the statute of limitations as a bar. Absent any affirmative plea of this special defense, we are not in a position to consider it. See United Business Corporation of America, 19 B.T.A. 809, affirmed (C.C.A., 2nd Cir.), 62 Fed. (2d) 754, certiorari *133 denied, 290 U.S. 635; Mertens "Law of Federal Income Taxation," § 50.21; Louis Halle, supra. We sustain respondent's determination as to the deficiencies, but not as to fraud. Decision will be entered under Rule 50. Footnotes
*. Died April 23, 1935.↩
1. Petitioner's typed-in designation.↩